HARRIS, ST. LAURENT
& WECHSLER LLP
L. Reid Skibell
Evan W. Bolla
40 Wall St., 53rd Floor
New York, NY 10005
Telephone: 212.397.3370
Facsimile: 212.202.6206

MCINTYRE THANASIDES BRINGGOLD
ELLIOTT GRIMALDI GUITO & MATTHEWS, P.A.
Christina Casadonte-Apostolou
Paul Thanasides
500 E. Kennedy Blvd., Suite 200,
Tampa, FL 33602
Telephone: 813.223.0000
Facsimile: 813.225.1221
**Attorneys for Plaintiff Nitrous Funding LLC**

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NITROUS FUNDING, LLC<br><br>          *Plaintiff,*<br><br>   v.<br><br>CARDINAL EQUITY, LLC, WAK<br>ENTERPRISES LLC d/b/a Recovery of<br>Judgement, ROJ EQUITY, LLC<br>and TVT CAPITAL LLC<br><br>         *Defendant.* | **Civil Action No.**<br><br>**20-cv-02216-PAE**<br><br>**PROPOSED SECOND<br>AMENDED COMPLAINT** |

Plaintiff Nitrous Funding, LLC ("Nitrous"), by and through undersigned counsel, states the following as its proposed Amended Complaint against Defendant Cardinal Equity, LLC ("Cardinal"), WAK Enterprises LLC d/b/a Recovery of Judgement ("WAK"), ROJ Equity, LLC ("ROJ") and TVT Capital LLC ("TVT") (Collectively referred to as "Defendants"):

**NATURE OF THE CASE**

1.      Nitrous brings this action to obtain an equitable accounting and determine damages stemming from Defendant Cardinal's breach of the agreement governing Nitrous' over $4 million investment in merchant cash advances ("MCAs") managed and administered by Cardinal.

2.      Despite promising investors full transparency in both its public representations and in its contract with Nitrous, Cardinal has refused requests by Nitrous' professional auditor to provide information necessary to assess Nitrous' investments with Cardinal and to assure Nitrous Cardinal is complying with its obligations.

3.      Raising further concerns, Nitrous' auditor's investigation has uncovered significant errors in the information Cardinal provided Nitrous, questionable systematic controls in place as part of Cardinal's information platform, unauthorized deductions to Nitrous' investments to pay a vendor, and a suspicious personal relationship between Cardinal and that vendor.

4.      For these reasons, Nitrous brings the current suit for damages for breach of contract and an accounting in order to determine the current status of Nitrous' investment.

**PARTIES**

5.      Plaintiff Nitrous is a limited liability company organized under the laws of Florida. Its principal place of business is located at 1800 NW Corporate Boulevard, Suite 300, Boca Raton, Florida 33431. All members of Nitrous are residents of Florida.

6.      Defendant Cardinal is a limited liability company organized under the laws of New Jersey that does business in New York.  Its principal place of business is located at 30 Wall Street, New York, New York, 10005. Upon information and belief, all members of Cardinal are residents of New York.

7.      Defendant WAK is a limited liability company organized under the laws of

Delaware that does business in New York. Its principal place of business is located in Nassau County, New York. Upon information and belief, all members of WAK Enterprises LLC are residents of New York.

8.    Defendant ROJ is a limited liability company organized under the laws of New York that does business in New York. Its principal place of business is located at 30 Wall Street, New York, New York, 10005. Upon information and belief, all members of ROJ are residents of New York.

9.    Defendant TVT is a limited liability company organized under the laws of Delaware that does business in New York. Its principal place of business is located in Nassau County, New York at 8 Hunter Lane Roslyn NY 11576. Upon information and belief, all members of WAK Enterprises LLC are residents of New York.

## JURISDICATION AND VENUE

10.    This Court has jurisdiction pursuant to U.S.C. § 1332(a)(1) as the parties are citizens of different States and the amount in controversy is greater than $75,000.

11.    Venue is proper pursuant to U.S.C. § 1391 (b)(1) as all Defendants' conduct business within this judicial district and all maintain their principal place of business within this judicial district.

## GENERAL ALLEGATIONS

### The Merchant Cash Advance Industry

12.    A MCA is a bank-alternative financing product that provides a business quick access to working capital through the sale of a portion of the business's future credit card receivables or gross sales receipts (the "Receivables").

13.    The business receives an up-front, lump sum payment it can use to fund its

immediate operational needs, which it repays from either an agreed-upon percentage of its daily credit card sales, or fixed Automated Clearing House ("ACH") debits from its business account, until the contracted amount advanced for the MCA is repaid in full.

14.    Often, MCAs are funded by financing companies using capital raised from multiple investors through a process referred to as "syndication."

15.    In a syndication, direct financing companies or independent sales partners provide information about MCA financing opportunities to companies offering MCA deal placement services ("Deal Syndicators") in exchange for commissions.

16.    The Deal Syndicators then offer qualified investors or third-party financing companies the opportunity to invest in the advance by purchasing a portion of the Receivables.

17.    The capital raised from the investors, or "participants," collectively, is used to fund all or part of the advance. In return, the participants are paid from the Receivables in amounts proportionate to their investment as funds are received.

18.    A participant in a syndication has no right to enforce the underlying MCA agreement, and no direct interest in the Receivables. It cannot collect funds owed by the business pursuant to the underlying MCA agreement, nor access information about the performance of the syndication on its own.

19.    Due to the nature of the transaction, a participant must rely on a manager to act as its agent in connection with the syndication. Often, the syndication manager is a "lead participant" and an investor in the advance with an interest in the underlying MCA.

20.    A critical part of syndication management involves keeping participants informed by providing them access to data about the status of their investments. The importance of providing participants quality, up-to-date information about each syndicated advance cannot be overstated.

Unless the syndication manager provides the participant accurate, comprehensive, and timely information, the participant has no way to determine whether the syndication is being properly managed and cannot accurately assess the performance of its investment.

21.    Since Deal Syndicators typically send investors leads on an on-going basis, having the information necessary to assess the success of prior participations is material to an investor's ability to judge the quality of the syndications offered by the Deal Syndicator, and its decision whether to participate in other offered investment leads.

**Cardinal Lures in Investors by Promising to Act in their Best Interests**

22.    Cardinal is a direct financing company and MCA Deal Syndicator that also provides syndication management services. It claims to be "the leading authority in the world of syndication management for syndicated merchant cash advances."

23.    For a fee, Cardinal offers to assume all management responsibilities related to syndicated advances.

24.    Cardinal claims the standard it employs in connection with its management services involves diligence and transparency.

25.    Cardinal promises on its website that it will "fully oversee the entire business cash advance process" for investors by tracking and monitoring syndications, collecting, and remitting

future purchased receivables to participants, reporting information and providing enforcement services. Cardinal also claims its "transparent syndication model, reporting, and due diligence for our partners will prove that 'collections' are our top priority!"

26.     Cardinal acknowledges the nature of the relationship between participants and syndication managers and accepts that it is entrusted to act on participants' behalf in connection with the syndication. On its website, Cardinal promises investors it will:

i.      "function as your broker to ensure your private equity is financially secure"; and

ii.     "represent your syndicate and deal with your loan recipients on your behalf to ensure that payments are being made and distributed between all of the lenders according to the terms of the deal."

### Nitrous Invests in Cardinal Syndications

27.     Nitrous is a company that provides working capital financing to small and medium sized businesses by, among other things, investing in MCAs on a participation basis.

28.     In the spring of 2017, Nitrous was searching for additional opportunities to invest in the merchant financing sector.

29.     Around that time, Nitrous learned about funding opportunities offered by Cardinal through "Redbird," a new proprietary accounting platform Cardinal developed to manage syndications.

30.     Cardinal claims on its website that Redbird uses "state of the art technology" to help manage investor's portfolio of syndications ("Participation Portfolio") and offers investors "complete control" over their investments. Cardinal promises investors that Redbird offers greater transparency than other platforms by providing participants easily accessible, up-to-date, and comprehensive information about their investments.

31.    Based on the representations made by Cardinal, which Nitrous reasonably relied on, and after conducting its own diligence, Nitrous elected to take the steps necessary to invest in Cardinal's syndications (the "Syndications").

32.    On August 29, 2017, Nitrous and Cardinal executed the Master Participation Agreement (the "Agreement"). A copy of the Master Participation Agreement is attached hereto as **Exhibit A**.

33.    The Agreement established the relationship between Nitrous and Cardinal as participant and lead participant, respectively, and set forth the parties' general rights and obligations in connection with all Cardinal syndications in which Nitrous would participate in the future.

34.    In the Agreement, Cardinal represented it would enter into contracts for MCAs by advancing funds to businesses (the "Client") in exchange for the purchase of Receivables (the "Merchant Agreements"). *See* Agreement at ¶A. Cardinal specifically represented that the Client's obligations under the Merchant Agreements had been guaranteed. *See* Agreement at ¶C.

35.    The Agreement provided that Cardinal, as lead participant, would, from time to time, offer Nitrous opportunities to invest in these MCAs (the "Offer") by funding a percentage of the gross amount that had been advanced by Cardinal to the Client (the "Participation Percentage"). *See* Agreement at ¶ ¶ A-B.

36.    If Nitrous accepted an Offer, Nitrous agreed to pay Cardinal the Participation Percentage (the "Participation Amount"), which included a fee to Cardinal for its management services and access to its syndication platform (the "Management Fee"), and, if applicable, its share of the commission owed to the independent sales agent ("Commission") that provided Cardinal the lead (the "Sales Agent"). *See* Agreement at ¶¶ 1.15,1.22, 1.23, 1.28, 2.2 and 2.3.

37.     Nitrous agreed to pay all Cardinal's direct out-of-pocket expenses incurred in connection with Transaction including residual commissions owed to Sales Partners and any costs for collecting the Receivables (the "Transaction Expenses"). *See* Agreement at §1.33.

38.     In exchange, Nitrous acquired a percentage of the Receivables proportionate to the Participation Amount. *See* Agreement at ¶¶ 1.23, 1.25, 2.1, and 2.3.

39.     For each syndication Nitrous participated in, Cardinal issued and remitted to Nitrous a Certificate of Participation that set forth a summary of the terms of the Syndication. A copy of an example of one of a Certificate of Participation is attached hereto as **Exhibit B**. *See* Agreement, §2.3-2.4.

40.     The Certificate of Participation detailed Nitrous' total investment in the Syndication, amounts owed to Cardinal for the Management Fee and Commission, and the recurring payment amount Nitrous would receive from Cardinal for its portion of Receivables. *See* Exhibit B.

41.     In exchange for the Management Fee, Cardinal assumed all management duties related to the transaction. *See* Agreement at §5.1. Cardinal promised to manage the transaction according to the standard of care provided in each Merchant Agreement, and with the same degree of care that it follows in similar transactions. *See* Agreement at §§1.32; 5.1.

42.     As part of its duties as manager, Cardinal agreed to collect the proceeds of the Receivables and pay Nitrous its pro-rata share, less expenses, and fees. *See* Agreement at ¶¶ 1.8; 2.3, 4.3. Cardinal specifically promised Nitrous it would receive its portion of the funds the day after the funds were collected. *Id*.

43.    Cardinal provided Nitrous a login to its Redbird syndication portal, where Nitrous could purportedly access information detailing the status of the performance of each Syndication (the "Account") as of the previous business day. *See* Agreement at ¶¶ 1.30 and 4.1.

44.    As part of its management duties, Cardinal was in charge of monitoring the performance of the account for each Account, updating the Account's performance status on Redbird, and enforcing the terms of the underlying merchant agreement so that funds were collected, including the collection of funds in the event an Account defaulted.

45.    Nitrous participated in its first Syndication with Cardinal in or around September 7, 2017.

46.    In the months that followed, Nitrous received and accepted additional Offers to participate in Cardinal Syndications through, Warren Fellus ("Warren Fellus"), who Nitrous believed to be acting as agent for Cardinal.

47.    Initially, Nitrous' Participation Portfolio with Cardinal appeared to be performing well.

48.    Encouraged by its success, Nitrous proceeded to invest between $200,000 and $250,000 a month as a participant in various Cardinal Syndications.

**Cardinal's Mismanagement and False Promises Come to Light**

49.    Under the terms of the Agreement, after providing Nitrous written notice, Cardinal could declare an Account in "liquidation" at any time if a default occurred under the terms of the MCA agreement. *See* Agreement at § 6.1.

50.    Once an Account was declared in liquidation, Cardinal could effectuate payment from Nitrous for any fees and costs incurred to enforce Cardinal's rights under the Merchant Agreement, including attorneys' fees and collections costs. *See* Agreement at ¶¶ 1.9 and 6.1.

51.     At Cardinal's request, Nitrous executed an ACH form authorizing Cardinal to debit amounts to fund its investments and pay any transaction expenses and collections costs from its account (collectively, "Expenses").

52.     Naturally, Nitrous trusted Cardinal to only withdraw Expenses permitted under the terms of the Agreement and incurred as a result of actions intended to serve Nitrous' interest of maximizing the return on its investment.

53.     In March 2018, approximately six months after its first participation with Cardinal, Nitrous noticed a decline in its daily payments of its pro-rata share of Receivables from Cardinal, and a material increase in the number of accounts Cardinal sent to "collections" ("Collections Accounts").

54.     The information provided on Cardinal's Redbird portal provided Nitrous little clarity about what was going on with its investments.

55.     Redbird indicated that Collections Accounts were "Closed: Early discount," "Closed: Write off" and "Closed: Settled" without providing any details beyond these imprecise labels.

56.     For Collections Accounts designated as actively in collections, Redbird lacked sufficient detail for Nitrous to determine when or why those Accounts were sent to collections, or the basis for the default Cardinal claimed, much less any way for Nitrous to evaluate if such declaration of default was proper.

57.     Cardinal's collection efforts remained unclear from the information Cardinal made available on Redbird. Nitrous had no way of knowing whether Cardinal was using commercially reasonable efforts to collect the amounts owed, or properly disbursing funds collected according

to the terms of the Agreement. In other words, despite its promises of transparency, Cardinal's entire collection system was in fact a black box to investors.

58.      Nitrous initially turned to Cardinal for an explanation. According to Cardinal, the dip in daily income Nitrous observed was only a temporary situation. Cardinal assured Nitrous that its Participation Portfolio was performing well.

59.      As the number of Collections Accounts increased, the amount of expenses purportedly incurred for collection efforts related to those accounts also increased.

60.      While the Agreement obligated Nitrous to pay a portion of collection costs, that obligation was triggered only after Cardinal first provided Nitrous written proof to support the claimed expenses. *See* Agreement at ¶ ¶ 1.9, 6.1 and 6.2.

61.      In a July 23, 2018, email, Cardinal informed Nitrous, for the first time, that it had been billing Nitrous for collection costs without first providing Nitrous notice or supporting documents, in violation of the terms of the Agreement. A copy of the July 23, 2018, email chain is attached hereto as **Exhibit C**.

62.      Nitrous learned that Cardinal had been making unauthorized deductions from its bank account for over nine months. Morgan Quinn ("Quinn"), Cardinal's Chief Operations Officer, stated, "[f]or those not yet aware, ROJ has been debiting our syndicators since Sept 2017 to cover the cost of filing Confessions of Judgment against merchants in default" despite Cardinal's failure to provide the necessary documentation required to make such deductions from Nitrous' bank account. *See id*.

63.      Quinn asked all syndicators to fill out an ACH form "to confirm [Cardinal's] collections company, ROJ, has the authorization to debit our syndicators' accounts." *See id*.

64.    Nitrous' managing member questioned Cardinal's Chief Executive Officer and Managing Partner, Arty Bujan ("Bujan"), as to why Cardinal needed authorization to debit its account now if Cardinal had been properly doing so for over nine months. Bujan explained, incorrectly, that Cardinal "already had authorization to debit and credit via our agreement," making it seem that such additional authority was simply an administrative paperwork issue. *See id*.

65.    In reliance upon Bujan's misrepresentation that Cardinal already possessed such authority and that additional paperwork was administrative in nature, Nitrous executed and returned the requested form. In executing the form, Nitrous trusted that Cardinal only asked for the authorization because it was needed for it to effectuate the withdrawals necessary to properly manage the Syndications.

66.    The pace of Cardinal's collections did not seem to improve.

67.    Over the next several months, Nitrous made numerous requests to Cardinal for information related to its Participation Portfolio and, specifically, how Cardinal was proceeding with collection efforts against accounts in default. None of the information Cardinal provided in response to the requests satisfied Nitrous' concerns about how its investments were performing, or how Cardinal was managing its Participation Portfolio.

68.    In May 2019, faced with a paucity of information, Nitrous hired a professional accountant to conduct a forensic analysis of its Participation Portfolio and prepare a comprehensive report about the status of its investments in Cardinal's Syndications (the "Auditor").

69.    On May 14, 2019, Nitrous' managing member introduced its Auditor to Bujan via email. In the email, he asked that Cardinal cooperate and provide the Auditor any information needed to conduct her analysis.

70.     Shortly thereafter, the Auditor commenced her analysis of Nitrous' Participation Portfolio.

**The Auditor's Analysis of Nitrous'**
**Participation Portfolio Ends with More Questions than Answers**

71.     Over the course of approximately three months, the Auditor reviewed and analyzed information available on Redbird and certain other information provided by Cardinal. As part of the investigation, the Auditor traveled to Cardinal's New York office to review documents and meet with Cardinal's representatives about the Participation Portfolio.

72.     During the course of the investigation, the Auditor found that Cardinal did not have a full understanding of Nitrous' Participation Portfolio. In fact, Cardinal excluded information for eleven Nitrous Syndications from the collections report it prepared at the Auditor's request.

73.     The Auditor learned that the Redbird platform did not automatically track and monitor accounts once those accounts were in collections. The Auditor also learned Cardinal did not have a systematic procedure for tracking collections information or reporting that information to participants.

74.     According to Cardinal, it receives "periodic" reports from its "collections companies," and then manually enters updates into Redbird based on the new information. Cardinal admitted, however, that some Accounts identified by the Auditor had not been timely updated on Redbird, and were not current as of the last business day, as required under the terms of the Agreement.

75.     The procedures employed by Cardinal permitted it to manipulate the information at will, and were otherwise ripe with opportunity for abuse.

76.     Furthermore, Cardinal did not routinely save or track its updates on Redbird, or notate when they were made.  As a result, the Auditor could not determine when or how frequently

Cardinal updated the collections information on Redbird, or track the collections history of Accounts to identify irregularities or trends in collections.

77.    The Auditor identified a number of instances where Cardinal entered false or misleading information onto Redbird about the Collections Accounts. Examples included instances where "notes" entered by Cardinal into Redbird stated a payment plan was in effect (i.e.

$200/day), when no such plan was in place and no payments were recorded, as well as instances where payments were recorded on Redbird as received prior to the time Cardinal collected those payments.

78.    The Auditor also identified instances wherein the collections information on Redbird was inaccurate or inconsistent with the information reflected on Cardinal's internal collections reports.

79.    In one instance, Cardinal designated an account on Redbird as "settled" before Cardinal had paid Nitrous its share of funds collected (the "Collections").

80.    In another instance, the same account Cardinal designated as "Closed: Write-Off" on Cardinal was listed as "Active" on Cardinal's internal collections report.

81.    The Auditor also discovered Cardinal sometimes waited weeks or months after collecting funds before paying Nitrous its share, a material violation of the terms of the Agreement.

82.    Due to the manner in which Cardinal provided the information, the Auditor was unable to determine whether the collections costs charged too Nitrous were proper or accurate.

83.    Cardinal refused to furnish any documentation whatsoever supporting the collections costs purportedly incurred by its collections companies, despite the Auditor's demand and Cardinal's obligation under the Agreement to furnish such information before charging Nitrous such costs.

84.     Likewise, the Auditor was unable to verify whether any of the collection efforts Cardinal claimed had been undertaken had in fact been undertaken. Cardinal refused to provide any information evidencing settlements or discounts purportedly provided by its collections company in connection with the Collections Accounts. On Redbird, Cardinal indicated the collections companies investigated assets, engaged in litigation, and communicated with Clients in an effort to collect the amounts owed. Cardinal would not provide supporting documentation related to any of these actions, despite the Auditor's request.

85.     In fact, Cardinal refused to provide any of the information the Auditor requested related to its collection efforts.

86.     Cardinal blamed its refusal to furnish collections information on the collections company. Cardinal claimed the "collections company declines to provide copies of documents and/or proprietary information regarding the collections process."

87.     Some of the specific requests made by the Auditor include communications between the collections company and Clients, proof of monies collected, and copies of recorded judgments. Clearly, none of the requested information is even arguably "proprietary."

88.     Cardinal's refusal to provide any supporting documentation of its collection efforts precluded the Auditor from analyzing the Collections Accounts, a significant portion of Nitrous' Participation Portfolio and the locus of many of the questions Nitrous concerning its investments with Cardinal.

89.     As a result, the Auditor could not complete her analysis of the Participation Portfolio, and, as such, could not provide Nitrous a comprehensive report about the status of its Participation Portfolio.

**Nitrous' Questions about its Participation Portfolio Remain Unanswered**

90.    The Auditor's findings confirm Cardinal breached the terms of the Agreement by failing to provide Nitrous supporting documentation before charging collection costs, failing to provide it information about Syndications current as of the last business day, and failing to pay Nitrous the amounts Cardinal owed Nitrous within a day after the funds cleared.

91.    The Auditor's findings also suggest Cardinal failed to manage the Participation Portfolio as Cardinal represented and promised pursuant to the terms of the Agreement in other ways.

92.    Contrary to its representations, Cardinal did not provide Nitrous with control, diligence, or transparency in connection with its Participation Portfolio. Rather, the nature and quality of information provided by Cardinal through Redbird suggests Cardinal purposefully hindered Nitrous' ability to understand the true status of the Collections Accounts and the performance of its Participation Portfolio.

93.    Upon information and belief, as established by the material change in performance after Nitrous' continued significant investment and the additional irregularities discussed herein, Cardinal negligently or intentionally manipulated Redbird using false and misleading information in order to artificially inflate the value of Nitrous' Participation Portfolio. As a result, Nitrous believed its Participation Portfolio was performing better than it was and continued to participate in Syndications offered to it by Cardinal.

94.    Based upon Cardinal's inaccurate valuation of Nitrous' Participation Portfolio, Nitrous invested over $4 million in participations offered and managed by Cardinal.

95.    Upon information and belief, Cardinal only uses one collections company, ROJ Equity, LLC ("ROJ") in connection with the Collection Accounts.

96.    Nitrous has learned that ROJ is operated by Stephen Fellus, the brother of Cardinal's agent Warren Fellus. Nitrous also discovered ROJ was incorporated in October 2017, just weeks after Warren Fellus introduced Nitrous to Cardinal's syndication opportunities. Strangely, Cardinal represented in its February 2018 email that it had been debiting Nitrous' account for collection costs incurred by ROJ since September 2017, a month prior to the time ROJ was formed.

97.    Upon information and belief, Cardinal and ROJ have an arrangement that incentivizes pushing Accounts into "collections." Upon information in belief, Cardinal and ROJ then charge amounts to participants under the guise of "collections costs" and collect funds that are never reported on Redbird or distributed to participants of Syndications.

98.    By unreasonably withholding documentation to support its collections efforts from Nitrous and its Auditor, Cardinal prevented Nitrous from confirming these suspicions.

99.    Cardinal's conduct clearly violates the standard of care it represented it would employ as manager of the Syndications, as specifically set forth in the Agreement, and further violates generally accepted industry standards.

100.    Upon information and belief, the Merchant Agreements contain further standards of care Cardinal agreed to employ in connection with Syndications.

101.    Since first participating with Cardinal, Nitrous has, on multiple occasions, asked Cardinal to provide it copies of merchant agreements for Syndications it participated in.  However, Cardinal has either ignored these requests, or refused to comply with Nitrous' requests.

102.    All conditions precedent to the maintenance of this action have occurred, have been performed, or have been waived.

12

**Newly Discovered Evidence**

103. Nitrous heavily relied on the Agreement in finalizing a relationship with Cardinal.

104. Nitrous has committed several breaches of the explicit covenants and agreements within the Agreement which further constitute breaches of Cardinal's fiduciary duties to Nitrous.

105. Cardinal made misrepresentations and omissions concerning the MCAs performance, Cardinal's relationship with corresponding entities (including TVT, ROJ, and WAK), and Cardinal's overall procedure for collecting and remitting delinquent MCAs on behalf of Nitrous.

106. Specifically, Cardinal has breached its fiduciary duties to Nitrous relating to violations of the following covenants and agreements asserted in the Agreement between Nitrous and Cardinal; 1.8 "Collections", 1.9 "Extraordinary Expenses", 2.4, 2.4.1, 2.4.2 concerning collections, 5.1 "MANAGEMENT DUTIES OF LEAD", and 6.1 & 6.2 – "IN LIQUIDATION".

107. In furtherance of Cardinal's breaches of the aforementioned fiduciary duties, TVT, ROJ, and WAK all aided and abetted and conspired to commit such breaches by knowingly inducing or participating in the breaches, resulting in damages to Nitrous.

108. TVT, ROJ, and WAK participated in Cardinal's breaches by, but not limited to; entering into agreements with Cardinal unknown to Nitrous, collecting on delinquent or defaulted MCAs without Nitrous' knowledge and/or without full transparency, as required, and failing to remit notice of extraordinary collection charges to Nitrous while, at the same time, charging and deducting said charges from Nitrous.

109. Further, upon information and belief, none of the agreements between Nitrous and TVT, ROJ, and WAK are materialized in writing. Additionally, Nitrous has only recently learned of the unorthodox relationship, unusual collection methods, and lack of overall transparency as to

the status and recovery of the defaulted MCAs.

110.    Unknown to Nitrous at the time it entered the Agreement, Cardinal, TVT, ROJ, and WAK are intermingled by close relationships, family ties, and oral agreements in contravention of the Agreement, as well as Cardinal's fiduciary duties to Nitrous.

111.    More so, Cardinal never explained or informed Nitrous of Cardinal's relationship with ROJ. It was just recently discovered that ROJ is owned entirely by WAK. Upon information and belief, WAK is a holding company for ROJ and is owned by four individuals, equally owning 25% of WAK; Warren Fellus, Kenny Fellus, Andres Fellus and Stephen Fellus. Such familial relationship between Cardinal, ROJ, and WAK was never disclosed too Nitrous.

112.    Further, it was discovered that TVT's Chief Executive Officer is listed as Andrew Fellus.

113.    In addition, TVT purportedly funded the MCAs, which Nitrous invested in. At no point, however, did Cardinal explain its relationship with TVT, nor did Nitrous know of TVT's full involvement.

## COUNT I
**Breach of Merchant Participation Agreement**

114.    Nitrous hereby readopts and realleges paragraphs 1-99 as though fully set forth herein.

115.    Nitrous and Cardinal were parties to the Agreement, a valid and enforceable contract.

116.    Nitrous performed all obligations owed to Cardinal under the terms of the Agreement.

117.    Cardinal breached its obligations under the Agreement by failing to provide Nitrous information regarding the status of Syndications current as of the last business day, failing to timely

14

pay Nitrous its share of Collections and failing to provide Nitrous supporting documentation of collections costs debited from its account.

118.    In addition, Cardinal failed to comply with the standard of care set forth in the Agreement, or any reasonable standard of care, in connection with its management of the Participation Portfolio by unreasonably withholding information vital to Nitrous' understanding of the status of the Participation Portfolio, failing to employ commercially reasonable efforts to maximize collections of amounts owed, and otherwise acting against Nitrous' interests in connection with the Participation Portfolio in violation of the terms of the Agreement.

119.    Cardinal's failure to comply with that standard of care is a further breach of the Agreement.

120.    Each of Cardinal's breaches of the Agreement are material breaches.

121.    As a result of Cardinal's multiple breaches of the Agreement, Nitrous has suffered damages in an amount estimated at over $700,000.00.

122.    Therefore, Nitrous is entitled to damages in an amount to be determined at trial, including compensatory damages and its attorney's fees pursuant to §9.2 of the Agreement.


## COUNT II
### Accounting

123.    Nitrous hereby readopts and realleges paragraphs 1-99 as though fully set forth herein.

124.    Nitrous and Cardinal's relationship involved additional factors and special circumstances such that it expanded beyond a mere business transaction and created a fiduciary relationship.

125.    The special circumstances that created a fiduciary duty between Nitrous and

Cardinal include:

    i.  Cardinal's representations that it would act as an agent for Nitrous in connection with all aspects of Nitrous' investments in the Syndications;

    ii.  Nitrous' entrustment of over $4 million to Cardinal to manage as promised under the terms of the Agreement and in accordance with generally accepted standards of care;

    iii.  The nature of the transactions, which required that Cardinal act as Nitrous' agent in connection with the Syndications;

    iv.  Nitrous' vulnerability due to having no direct rights under the Merchant Agreement, or in connection with managing the Syndications;

    v.  Cardinal held itself out as, and in fact was, in a position of power in relation to Nitrous in connection with the Syndications;

    vi.  Cardinal held itself out as, and in fact was, uniquely situated to gather and report information related to the Syndications, enforce the terms of the underlying Merchant Agreements and otherwise manage the Syndications on Nitrous' behalf.

126.    Cardinal engaged in misconduct that constitutes a breach of its fiduciary duty owed to Nitrous by:

    i.  Providing Nitrous inaccurate, untimely, and incomplete information regarding its Participation Portfolio;

    ii.  Unreasonably withholding information about its collection efforts in connection with Nitrous' investments, despite demand; and

    iii.  Failing to manage Nitrous' Participation Portfolio in accordance with any recognizable standard of care.

127.    During the parties' relationship, Nitrous entrusted Cardinal with over $4 million on over 400 occasions pursuant to a course of conduct established by the parties.

128.    Cardinal manifested an intent to act as Nitrous' agent in connection with the Syndications.

129.    Cardinal accepted the undertaking of acting as Nitrous' agent in connection with the Syndications.

130.    Nitrous understood that Cardinal was in control of the management of its Syndications due to the nature of the transactions, which required Cardinal to act as Nitrous' agent, and Cardinal's representations and obligations under the Agreement.

131.    Nitrous has an ongoing interest in an accounting of the money it entrusted to Cardinal.

132.    Nitrous has no other adequate remedy at law available.

133.    Nitrous has previously made demands upon Cardinal for an accounting of its money but Cardinal has refused to provide any such accounting.

134.    Nitrous has attempted to obtain the information required to conduct the accounting itself, but Cardinal has unreasonably withheld the information necessary to do so.

135.    An accounting is necessary to determine the status of Nitrous' Participation Portfolio and to determine whether Cardinal properly managed Nitrous' investments.

## COUNT III
### Breach of Fiduciary Duty as to Cardinal

136.    Nitrous hereby readopts and realleges paragraphs 1-114 as though fully set forth herein.

137.    Nitrous and Cardinal were parties to the Agreement, a valid and enforceable contract.

138.    Nitrous performed all obligations owed to Cardinal under the terms of the Agreement.

139.    Pursuant to the language and intent of the Agreement, Cardinal owed Nitrous a fiduciary duty in their management and administration of MCA investments with Cardinal.

140.    Cardinal breached its duties, covenants, and promises under the Agreement by failing to provide Nitrous full transparency in both its public representations and in its contract with Nitrous, Cardinal has continually refused requests by Nitrous' professional auditor to provide information necessary to assess Nitrous' investments with Cardinal and to assure Nitrous that Cardinal is complying with its obligations.

141.    Further, there were significant errors in the information Cardinal provided Nitrous, questionable systematic controls in place as part of Cardinal's information platform, unauthorized deductions to Nitrous' investments to pay a vendor (including ROJ and WAK), and a suspicious personal relationship between Cardinal and additional parties (including ROJ and WAK).

142.    Cardinal's inaccurate and incomplete communications and documentation relayed to Nitrous, as to induce it to invest and stay invested in the MCAs, clearly establishes a breach of fiduciary duty claim.

143.    In addition, Cardinal failed to comply with the standard of care set forth in the Agreement, or any reasonable standard of care, in connection with its management of the Participation Portfolio by unreasonably withholding information vital to Nitrous' understanding of the status of the Participation Portfolio, failing to employ commercially reasonable efforts to maximize collections of amounts owed, and otherwise acting against Nitrous' interests in connection with the Participation Portfolio in violation of the terms of the Agreement.

144.    Cardinal's failure to comply with that standard of care is a further breach of

Cardinal's fiduciary duties.

145.    Each of Cardinal's breaches of the fiduciary duties owed are material breaches.

146.    As a result of Cardinal's multiple breaches, Nitrous has suffered damages in an amount estimated at over $700,000.00.

147.    Therefore, Nitrous is entitled to damages in an amount to be determined at trial, including compensatory damages and its attorney's fees pursuant to §9.2 of the Agreement.

## **COUNT IV**
### **Aiding and Abetting Breach of Fiduciary Duty as to ROJ**

148.    Nitrous hereby readopts and realleges paragraphs 1-114 as though fully set forth herein.

149.    Nitrous has discovered oral agreements between Cardinal and ROJ, which such agreements were never disclosed too Nitrous. It is believed that these oral agreements reflect the procedure for collection and the payments to be made to Nitrous and the involvement of the additional Defendants, TVT and WAK. Such agreements are not materialized in writing.

150.    More so, Nitrous has learned of an unorthodox relationship, unusual collection methods and the lack of overall transparency as to the status and recovery of the defaulted MCAs or loans.

151.    Nitrous recently learned that Cardinal and ROJ are intermingled by family ties and oral agreements in contravention of the management agreement as well as Cardinal's fiduciary duties.

152.    Further, it was just recently discovered that ROJ is owned entirely by WAK. WAK is a holding company for ROJ and is owned by four individuals, equally owning 25% of WAK; Warren Fellus, Kenny Fellus, Andres Fellus and Stephen Fellus. These close familial relationships between Cardinal, ROJ and WAK were never disclosed too Nitrous.

153.    Moreover, Cardinal failed to disclose its relationship with TVT. The Chief Executive Officer of TVT is Andrew Fellus, 25% owner of WAK, and therefore, part owner of ROJ.

154.    There has always existed clear lack or procedure and transparency by Cardinal at the inception of its relationship with Nitrous.

155.    For the reasons outlined above, Cardinal clearly breached the fiduciary duties owed to Nitrous.

156.    ROJ aided and abetted and conspired to commit and/facilitate Cardinal's breaches of the aforementioned fiduciary duties by knowingly inducing or participating in the breach, resulting in damages to Nitrous.

157.    Each of Cardinal's breaches of the fiduciary duties owed are material breaches.

158.    As a result of Cardinal's multiple breaches, Nitrous has suffered damages in an amount estimated at over $700,000.00.

159.    Therefore, Nitrous is entitled to damages in an amount to be determined at trial, including compensatory damages.

## <u>COUNT V</u>
**Aiding and Abetting Breach of Fiduciary Duty as to WAK**

160.    Nitrous hereby readopts and realleges paragraphs 1-114 as though fully set forth herein.

161.    Nitrous has learned of an unorthodox relationship, unusual collection methods and the lack of overall transparency as to the status and recovery of the defaulted MCAs or loans.

162.    Nitrous recently learned that TVT, ROJ, and WAK are intermingled by family ties and oral agreements in contravention of the management agreement as well as Cardinal's fiduciary duties.

163.    Further, ROJ is owned entirely by WAK. WAK is a holding company for ROJ and is owned by four individuals, equally owning 25% of WAK; Warren Fellus, Kenny Fellus, Andres Fellus and Stephen Fellus. These close familial relationships between Cardinal, ROJ and WAK were never disclosed too Nitrous.

164.    Moreover, Cardinal failed to disclose its relationship with TVT. The Chief Executive Officer of TVT is Andrew Fellus, 25% owner of WAK, and therefore, part owner of ROJ Equity, LLC.

165.    For the reasons outlined above, Cardinal clearly breached the fiduciary duties owed to Nitrous, which WAK aided and abetted and conspired to commit and/facilitate by knowingly inducing or participating in the breach, resulting in damages to Nitrous.

166.    Each of Cardinal's breaches of the fiduciary duties owed are material breaches.

167.    As a result of Cardinal's multiple breaches, Nitrous has suffered damages in an amount estimated at over $700,000.00.

168.    Therefore, Nitrous is entitled to damages in an amount to be determined at trial, including compensatory damages.

### COUNT VI
### Aiding and Abetting Breach of Fiduciary Duty as to TVT

169.    Nitrous hereby readopts and realleges paragraphs 1-114 as though fully set forth herein.

170.    More so, Nitrous has learned of an unorthodox relationship, unusual collection methods and the lack of overall transparency as to the status and recovery of the defaulted MCA's or loans.

171.    Nitrous recently learned that TVT, ROJ and WAK are intermingled by family ties and oral agreements in contravention of the management agreement as well as Cardinal's fiduciary

duties.

172.    Further, ROJ is owned entirely by WAK. WAK is a holding company for ROJ and is owned by four individuals, equally owning 25% of WAK; Warren Fellus, Kenny Fellus, Andres Fellus and Stephen Fellus. These close familial relationships between Cardinal, ROJ and WAK were never disclosed too Nitrous.

173.    Moreover, Cardinal failed to disclose of its relationship with TVT. The Chief Executive Officer of TVT is Andrew Fellus, 25% owner of WAK, and therefore, part owner of ROJ Equity, LLC.

174.    More so, Nitrous also discovered, through the oral deposition of Arty Bujan, that TVT funded the MCAs in which Nitrous invested. This information was never disclosed to Nitrous, prior to investing in the MCAs which Cardinal managed and administered.

175.    For the reasons outlined above, Cardinal clearly breached the fiduciary duties which TVT aided and abetted and conspired to commit and/facilitate by knowingly inducing or participating in the breach, resulting in damages to Nitrous.

176.    Each of Cardinal's breaches of the fiduciary duties owed are material breaches.

177.    As a result of Cardinal's multiple breaches, Nitrous has suffered damages in an amount estimated at over $700,000.00.

178.    Therefore, Nitrous is entitled to damages in an amount to be determined at trial, including compensatory damages.

## COUNT VII
### Conspiracy to Commit Breach of Fiduciary Duty as to ROJ

179.    Nitrous hereby readopts and realleges paragraphs 1-114 as though fully set forth herein.

180.    Nitrous has learned of an unorthodox relationship, unusual collection methods and

22

the lack of overall transparency as to the status and recovery of the defaulted MCA's or loans.

181.    Nitrous recently learned that TVT, ROJ and WAK are intermingled by family ties and oral agreements in contravention of the management agreement as well as Cardinal's fiduciary duties.

182.    Further, ROJ is owned entirely by WAK. WAK is a holding company for ROJ and is owned by four individuals, equally owning 25% of WAK; Warren Fellus, Kenny Fellus, Andres Fellus and Stephen Fellus. These close familial relationships between Cardinal, ROJ and WAK were never disclosed too Nitrous.

183.    Moreover, Cardinal failed to disclose of its relationship with TVT. The Chief Executive Officer of TVT is Andrew Fellus, 25% owner of WAK, and therefore, part owner of ROJ Equity, LLC.

184.    For the reasons outlined above, Cardinal clearly breached the fiduciary duties owed to Nitrous and ROJ conspired to commit and/or facilitate Cardinal's breaches of the aforementioned fiduciary duties by knowingly inducing or participating in the breach, resulting in damages to Nitrous.

185.    Further, ROJ's overt actions of contracting with Cardinal, participating the collection of debts, benefiting financially from the collections and the failure to adequately identify the relationship between Cardinal and ROJ constitutes a clear claim for conspiracy to breach such fiduciary duties.

186.    Each of Cardinal's breaches of the fiduciary duties owed are material breaches.

187.    As a result of Cardinal's multiple breaches, Nitrous has suffered damages in an amount estimated at over $700,000.00.

188.    Therefore, Nitrous is entitled to damages in an amount to be determined at trial,

including compensatory damages.

<u>COUNT VIII</u>
**Conspiracy to Commit Breach of Fiduciary Duty as to WAK**

189.    Nitrous hereby readopts and realleges paragraphs 1-114 as though fully set forth herein.

190.    Nitrous has learned of an unorthodox relationship, unusual collection methods and the lack of overall transparency as to the status and recovery of the defaulted MCA's or loans.

191.    Nitrous recently learned that TVT, ROJ and WAK are intermingled by family ties and oral agreements in contravention of the management agreement as well as Cardinal's fiduciary duties.

192.    Further, ROJ is owned entirely by WAK. WAK is a holding company for ROJ and is owned by four individuals, equally owning 25% of WAK; Warren Fellus, Kenny Fellus, Andres Fellus and Stephen Fellus. These close familial relationships between Cardinal, ROJ and WAK were never disclosed too Nitrous.

193.    Moreover, Cardinal failed to disclose of its relationship with TVT. The Chief Executive Officer of TVT is Andrew Fellus, 25% owner of WAK, and therefore, part owner of ROJ Equity, LLC.

194.    For the reasons outlined above, Cardinal clearly breached the fiduciary duties owed to Nitrous and WAK conspired to commit and/or facilitate Cardinal's breaches of the aforementioned fiduciary duties by knowingly inducing or participating in the breach, resulting in damages to Nitrous.

195.    Further, WAK's overt actions of contracting with Cardinal, participating the collection of debts, benefiting financially from the collections and the failure to adequately identify the relationship between Cardinal and WAK constitutes a clear claim for conspiracy to breach such

fiduciary duties.

196.    Each of Cardinal's breaches of the fiduciary duties owed are material breaches.

197.    As a result of Cardinal's multiple breaches, Nitrous has suffered damages in an amount estimated at over $700,000.00.

198.    Therefore, Nitrous is entitled to damages in an amount to be determined at trial, including compensatory damages.

<u>**COUNT IX**</u>
**Conspiracy to Commit Breach of Fiduciary Duty as to TVT**

199.    Nitrous hereby readopts and realleges paragraphs 1-114 as though fully set forth herein.

200.    Nitrous has learned of an unorthodox relationship, unusual collection methods and the lack of overall transparency as to the status and recovery of the defaulted MCA's or loans.

201.    Nitrous recently learned that TVT, ROJ and WAK are intermingled by family ties and oral agreements in contravention of the management agreement as well as Cardinal's fiduciary duties.

202.    Further, ROJ is owned entirely by WAK. WAK is a holding company for ROJ and is owned by four individuals, equally owning 25% of WAK; Warren Fellus, Kenny Fellus, Andres Fellus and Stephen Fellus. These close familial relationships between Cardinal, ROJ and WAK were never disclosed too Nitrous.

203.    Moreover, Cardinal failed to disclose of its relationship with TVT. The Chief Executive Officer of TVT is Andrew Fellus, 25% owner of WAK, and therefore, part owner of ROJ Equity, LLC.

204.    For the reasons outlined above, Cardinal clearly breached the fiduciary duties owed to Nitrous and TVT conspired to commit and/or facilitate Cardinal's breaches of the aforementioned

fiduciary duties by knowingly inducing or participating in the breach, resulting in damages to Nitrous.

205.     Further, TVT's overt actions of contracting with Cardinal, participating the collection of debts, benefiting financially from the collections and the failure to adequately identify the relationship between Cardinal and TVT constitutes a clear claim for conspiracy to breach such fiduciary duties.

206.     Each of Cardinal's breaches of the fiduciary duties owed are material breaches.

207.     As a result of Cardinal's multiple breaches, Nitrous has suffered damages in an amount estimated at over $700,000.00.

208.     Therefore, Nitrous is entitled to damages in an amount to be determined at trial, including compensatory damages.

## **PRAYER FOR RELIEF**

Plaintiff respectfully requests a judgment:

(a)     Awarding damages to be determined at trial, pre-judgment interest, post-judgment interest, attorneys' fees and costs;

(b)     Requiring that Defendant conduct an accounting of Plaintiff's Participation Portfolio; and

(c)     Granting such other relief, including interest, as may be just and appropriate.

## **JURY DEMAND**

Plaintiff demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated July 21, 2021

Respectfully submitted,

/s/ Paul Thanasides

Paul Thanasides
Florida Bar No. 103039
paul@mcintyrefirm.com
clservice@mcintyrefirm.com
Christina Casadonte-Apostolou
Florida Bar No. 101070
christina@mcintyrefirm.com
complexlit@mcintyrefirm.com
McIntyre Thanasides Bringgold Elliot
    Grimaldi Guito & Matthews, P.A.
500 E. Kennedy Blvd.
Suite 200
Tampa, FL 33602
Telephone: 813.223.0000
Facsimile: 813.225.1221
Attorneys for Plaintiff

and

L. Reid Skibell
Evan W. Bolla
HARRIS, ST. LAURENT &
WECHSLER LLP
40 Wall Street, 53rd Floor
New York, NY 10005
Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 21, 2021, a true and correct copy of the foregoing was

electronically served via electronic mail to all counsel of record, including:

Martin Shell
The Shell Law Firm, PLLC
11 Broadway
Ste. 615
New York, NY 10004
Telephone: 646.616.3983
Facsimile: 212.480.8560
mshell@shelllawfirm.com
Attorney for Defendant

Evan Wilson Bolla
Harris St. Laurent, LLP
40 Wall St.
Ste. 53rd Floor
New York, NY 10005
Telephone: 917.512.9472
Facsimile: 212.202.6206
ewbolla@sc-harris.com

Lindsey Rudd Skibell
Harris St. Laurent, LLP
40 Wall St.
Ste. 53rd Floor
New York, NY 10005
Telephone: 212.397.3370
rskibell@sc-harris.com

By U.S. Mail:

Cardinal Equity, LLC
30 Wall St.
New York, NY 10005

*/s/ Paul Thanasides*
Attorney